CINCINNATI SOAP CO. *v.* UNITED STATES.*

No. 659. Argued April 1, 2, 1937.—Decided May 3, 1937.

---

* Together with No. 687, *Haskins Bros. & Co.* v. *O'Malley, Collector of Internal Revenue.* Certiorari to the Circuit Court of Appeals for the Eighth Circuit.

*Mr. Alfred Bettman,* with whom *Mr. James L. Magrish* was on the brief, for Cincinnati Soap Co., petitioner in No. 659.

*Mr. Frederick H. Wood,* with whom *Messrs. Alfred C. Munger, William Stanley,* and *Thomas T. Cooke* were on the brief, for Haskin Brothers & Co., Inc., petitioner in No. 687.

*Assistant Attorney General Jackson,* with whom *Solicitor General Reed, Assistant Attorney General Morris,* and *Messrs. Sewall Key, F. A. Le Sourd,* and *Charles A. Horsky* were on the brief, for respondents.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

Section 602½ of the Revenue Act of 1934, c. 277, 48 Stat. 680, 763, imposes a tax of 3 cents per pound upon the first domestic processing of coconut oil, and provides that all such taxes collected with respect to coconut oil wholly of Philippine production, etc., "shall be held as a separate fund and paid to the Treasury of the Philippine Islands, but if at any time the Philippine Government provides by any law for any subsidy to be paid to the pro-

ducers of copra, coconut oil, or allied products, no further payments to the Philippine Treasury shall be made under this subsection."

Both petitioners are engaged in manufacturing soap and, at times stated in their petitions, used in its manufacture large quantities of coconut oil wholly the product of the Philippine Islands. In pursuance of § 602½, they made returns and paid the amount of the tax as required by that section. Subsequently, each of them filed with the Bureau of Internal Revenue a claim for the refund of the tax, on the ground that the imposition was not within the constitutional power of Congress. Both claims were denied, and petitions at law were filed in federal district courts to recover the sums paid. Demurrers were interposed attacking the sufficiency of the petitions, and these demurrers were sustained by the trial courts. Appeals were taken to the respective circuit courts of appeal named in the title; and we granted writs of certiorari before a hearing or submission in those courts, because of the importance to the Philippine Islands of an early final decision of the question.

The validity of the tax is assailed by petitioners upon a variety of grounds, developed at length in their respective briefs and by the oral arguments at the bar. So far as we find it necessary to consider the various contentions, they may be stated in general terms as follows: that the tax is not imposed for any purpose contemplated by the taxing clause of § 8, Art. I, of the Federal Constitution—that is to say, it is not imposed to pay the debts or provide for the common defense or general welfare of the United States; that, on the contrary, it is imposed for a purely local purpose, in violation of the Tenth Amendment; that the exaction violates the due process clause of the Fifth Amendment, because it is an arbitrary exaction from one group of persons for the exclusive benefit

of another; that the act does not impose a true tax, but is a regulatory measure outside the field of federal power; that it violates clause 7, § 9, of Art. I of the Constitution, which provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"; that the payment in bulk of the entire proceeds of the tax to the Philippines, with no direction as to the expenditure thereof, constitutes an unlawful delegation of legislative power. In dealing with these contentions, we find it convenient to do so without following the precise order in which they have just been stated. And certain of them are so interrelated that they may be joined for consideration in the same subdivision of the opinion which follows.

*First.* Plainly, the imposition of the tax in itself is a valid exercise of the taxing power of the federal government. It is purely an excise tax upon a manufacturing process for revenue purposes, and in no sense a regulation of the process itself. The Tenth Amendment is without application, since the powers of the several states over local affairs are not invaded or involved. This is disclosed upon the face of the act so clearly that discussion could not make it plainer. *United States* v. *Butler,* 297 U. S. 1, relied upon by petitioner, is not in point. There, we held that the sole aim of the statute, as shown by its terms, was to regulate a local situation, a matter wholly within the reserved powers of the states; and moreover that it amounted to a naked taking of the property of one group of persons for bestowal upon another group. The *Child Labor Tax Case,* 259 U. S. 20, and other cases cited, bear still more remotely upon the contention. It is enough to say that the feature of the present case which differentiates it from all those cited is that the exaction here, both in form and substance, is a true tax, imposed, as we presently shall show, for a

federal constitutional purpose. In that view the due process clause of the Fifth Amendment is not involved.

*Second.* Standing apart, therefore, the tax is unassailable. It is said to be bad because it is earmarked and devoted from its inception to a specific purpose. But if the tax, *qua* tax, be good, as we hold it is, and the purpose specified be one which would sustain a subsequent and separate appropriation made out of the general funds of the Treasury, neither is made invalid by being bound to the other in the same act of legislation. The only concern which we have in that aspect of the matter is to determine whether the purpose specified is one for which Congress can make an appropriation without violating the fundamental law. If Congress, for reasons deemed by it to be satisfactory, chose to adopt the quantum of receipts from this particular tax as the measure of the appropriation, we perceive no valid basis for challenging its power to do so.

We inquire first—Is the proposed *appropriation* to the Philippine Treasury for a constitutional purpose? since an affirmative answer to that question will establish the constitutional purpose of the *tax.* The pertinent taxing clause provides in general terms (Art. I, § 8, cl. 1) that taxes may be laid "to pay the Debts and provide for the common Defence and general Welfare of the United States." Primarily, and in a very high degree, whether a tax serves any of these purposes is a practical question addressed to the law-making department. And it will require a very plain case to warrant the courts in setting aside the conclusion of Congress in that regard. Compare *Nicol* v. *Ames,* 173 U. S. 509, 514–516. Nevertheless, such plain cases may exist; and the question is whether this is one of them.

The Philippine Islands and their inhabitants, from the beginning of our occupation, have borne a peculiar

relation to the United States. The Islands constitute a dependency over which the United States, for more than a generation, has had and exercised supreme power of legislation and administration, *Posadas* v. *National City Bank,* 296 U. S. 497, 502, a power limited only by the terms of the treaty of cession and those principles of the Constitution which by their nature are inherently inviolable. The possession of this well-nigh absolute power over a dependent people carries with it great obligations, as was pointed out by Mr. Root as Secretary of War in 1899. After referring to the practically unlimited power which we had over the Philippines, he said: "I assume, also, that the obligations correlative to this great power are of the highest character, and that it is our unquestioned duty to make the interests of the people over whom we assert sovereignty the first and controlling consideration in all legislation and administration which concerns them, and to give them, to the greatest possible extent, individual freedom, self-government in accordance with their capacity, just and equal laws, and opportunity for education, for profitable industry, and for development in civilization." Military and Colonial Policy of the United States, 161–162.

Among these correlative duties is the moral obligation to protect, defend, and provide for the general welfare of, the inhabitants. And such an obligation well may require the appropriation and expenditure of money from the national purse—in which case the obligation fairly comes within the term "debts" as used in the taxing clause. *United States* v. *Realty Co.,* 163 U. S. 427, 440–441. Congress, from the beginning of its existence, has accepted and legislated upon that view of the broad meaning of the term. In innumerable instances, it has made appropriations to relieve needs caused by earthquakes, fire, and other events, not only in localities

within or possessed by the United States, but in foreign countries as well. Government counsel has furnished us an impressive list of appropriations of this character; and in addition has called attention to the many instances of appropriations for the support and welfare of the Indians, and for the uses of the territories. Legislation of this character has been so long continued and its validity so long unquestioned that, as we said in *United States* v. *Curtiss-Wright Corp.*, 299 U. S. 304, 322, 327–328, "A legislative practice such as we have here, evidenced not by only occasional instances, but marked by the movement of a steady stream for a century and a half of time, goes a long way in the direction of proving the presence of unassailable ground for the constitutionality of the practice, to be found in the origin and history of the power involved, or in its nature, or in both combined."

It may be that the tax and the appropriation of the proceeds therefrom in the present instance could be justified as an exercise of the taxing power to provide, in a broad sense, for the public defense or the general welfare of the United States. We do not pause to consider that view; for plainly, we think, the law may be sustained as an act in discharge of a high moral obligation, amounting to a "debt" within the meaning of the Constitution as it always has been practically construed. The justification for that conclusion has been so fully stated by this court in the case of *United States* v. *Realty Co., supra,* that further citation becomes unnecessary. "Under the provisions of the Constitution, (article 1, section 8)," we there said, "Congress has power to lay and collect taxes, etc., 'to pay the debts' of the United States. Having power to raise money for that purpose, it of course follows that it has power when the money is raised to appropriate it to the same object. What are the debts of the United

States within the meaning of this constitutional provision? It is conceded and indeed it cannot be questioned that the debts are not limited to those which are evidenced by some written obligation or to those which are otherwise of a strictly legal character. The term 'debts' includes those debts or claims which rest upon a merely equitable or honorary obligation, and which would not be recoverable in a court of law if existing against an individual. The nation, speaking broadly, owes a 'debt' to an individual when his claim grows out of general principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. The power of Congress extends at least as far as the recognition and payment of claims against the government which are thus founded. To no other branch of the government than Congress could any application be successfully made on the part of the owners of such claims or debts for the payment thereof. Their recognition depends solely upon Congress, and whether it will recognize claims thus founded must be left to the discretion of that body. Payments to individuals, not of right or of a merely legal claim, but payments in the nature of a gratuity, yet having some feature of moral obligation to support them, have been made by the government by virtue of acts of Congress, appropriating the public money, ever since its foundation. Some of the acts were based upon considerations of pure charity. A long list of acts directing payments of the above general character is appended to the brief of one of the counsel for the defendants in error. The acts are referred to not for the purpose of asserting their validity in all cases, but as evidence of what has been the practice of Congress since the adoption of the Constitution. See, also, among

other cases in this court, *Emerson* v. *Hall,* 13 Pet. 409; *United States* v. *Price,* 116 U. S. 43; *Williams* v. *Heard,* 140 U. S. 529. The last cited case arose under an act of Congress in relation to the Alabama claims."

Later decisions of this court have followed that view. *United States* v. *Cook,* 257 U. S. 523; *Marion & R. V. Ry. Co.* v. *United States,* 270 U. S. 280, 284. The determination of Congress to recognize the moral obligation of the nation to make an appropriation as a requirement of justice and honor, is obviously a matter of policy and discretion not open to judicial review unless in circumstances which here we are not able to find. *United States* v. *Realty Co., supra,* p. 444.

It does not follow that because a federal tax levied for the express purpose of paying the debts or providing for the welfare of a state might be invalid (*Passenger Cases,* 7 How. 283, 446) that such a tax for the uses of a territory or dependency would likewise be invalid. A state, except as the Federal Constitution otherwise requires, is supreme and independent. It has its own government, with full powers of taxation and full power to appropriate the revenues derived therefrom. A dependency has no government but that of the United States, except in so far as the United States may permit. The national government may do for one of its dependencies whatever a state might do for itself or one of its political subdivisions, since over such a dependency the nation possesses the sovereign powers of the general government plus the powers of a local or a state government in all cases where legislation is possible. Compare *Stoutenburgh* v. *Hennick,* 129 U. S. 141, 147; *National Bank* v. *County of Yankton,* 101 U. S. 129, 133; *Mormon Church* v. *United States,* 136 U. S. 1, 42; *Utter* v. *Franklin,* 172 U. S. 416, 423. To say that the federal government, with such practically unlimited powers of legislation in respect of a dependency, is yet

powerless to appropriate money for its needs, is to deny—what the foregoing considerations forbid us to deny—that the United States has, in that regard, the equivalent power of a state in comparable circumstances.

*Third.* In the exercise of its plenary powers, the United States began by governing the Philippine Islands under the war power. Following the Treaty of Paris, a condition of armed insurrection persisted for some time. In 1900, military government was succeeded by a species of executive government. The Spooner Amendment to the Army Appropriation Bill of March 2, 1901, c. 803, 31 Stat. 895, 910, provided that "All military, civil, and judicial powers necessary to govern the Philippine Islands . . . shall, until otherwise provided by Congress, be vested in such person and persons and shall be exercised in such manner as the President of the United States shall direct, for the establishment of civil government and for maintaining and protecting the inhabitants of said islands in the free enjoyment of their liberty, property, and religion."

This was followed, March 5, 1901, by a cable from the Secretary of War to the Philippine Commission containing the following laconic order, "Until further orders government will continue under existing instructions and orders." Report, Secretary of War, 1901, p. 54. The comprehensive Spooner Amendment, and these instructions and orders, virtually constituted for many months the charter of government for the Philippine Islands. In 1902, Congress provided for a complete system of civil government under the original Philippine Organic Act. By degrees, the active powers of the dependency have been enlarged, and those of the federal government decreased. But the authority which conferred additional power might at any time have withdrawn it. This brief résumé demonstrates both the completeness and flexibil-

ity of the national power over the Philippines, and the high character of the moral obligations which the possession of such power correlatively imposes. With the extension of power to the islands, our moral obligations may have grown less; but whether, or to what extent, this has been the case is a question for the determination of the political departments of the government.

But it is contended that the passage of the Philippine Independence Act of March 24, 1934, c. 84, 48 Stat. 456, and the adoption and approval of a constitution for the Commonwealth of the Philippine Islands have created a different situation; and that since then, whatever may have been the case before, the United States has been under no duty to make any financial contribution to the islands. Undoubtedly, these acts have brought about a profound change in the status of the islands and in their relations to the United States; but the sovereignty of the United States has not been, and, for a long time, may not be, finally withdrawn. So far as the United States is concerned, the Philippine Islands are not yet foreign territory. By express provision of the Independence Act, we still retain powers with respect to our trade relations with the islands, with certain exceptions set forth particularly in the act. We retain powers with respect to their financial operations and their currency; and we continue to control their foreign relations. The power of review by this court over Philippine cases, as now provided by law, is not only continued, but is extended to all cases involving the Constitution of the Commonwealth of the Philippine Islands.

Thus, while the power of the United States has been modified, it has not been abolished. Moral responsibilities well may accompany the process of separation from this country; and, indeed, they may have been intensified by the new and perplexing problems which the Phil-

ippine people now will be called upon to meet as one of its results. The existence and character of the consequent obligations and the extent of the relief, if any, which should be afforded by the United States in respect of them, are matters, not for judicial but for Congressional consideration and determination.

It is not improbable that a failure to exercise control over imports from the Philippines would injuriously affect the industries of this country; and, on the other hand, an exercise of the power to tax imports might prove injurious to the people of the islands. Congress, in passing the legislation here under consideration, is not forbidden to balance these respective probabilities. The tax itself, it is said, was imposed for the purpose of protecting certain industries in this country; and it is challenged on that ground. That Congress has power to levy a tax with the collateral purpose of thereby protecting the industries of the United States is no longer open to doubt. *Hampton & Co.* v. *United States,* 276 U. S. 394, 411. But, in exercising the power here with that purpose, Congress may have concluded that it would thereby impose a hardship upon the Philippines which it was the moral duty of Congress to redress so far as possible. In that situation, we see no constitutional objection to a discharge of the duty by the appropriation of an amount equivalent to the tax in order to offset the anticipated burden. Certainly, this court cannot judicially declare that justice and fair dealing in respect of a people, not yet completely independent of our authority, does not warrant such action.

Nor do we see any objection to the plan because the payment of the funds is subject to the condition that the Philippine Government shall not provide for any subsidy to be paid to the Philippine producers of coconut oil and the other products named in § 602½ of the act.

It is perfectly plain that since Congress may levy the tax with the collateral purpose of protecting the industries of this country, it may in appropriating the proceeds put such restriction upon their use as will prevent the purpose from being nullified. This, we think, is the aim and the effect of the proviso.

*Fourth.* The contention that there has been no constitutional appropriation, or that any attempted appropriation is bad, because the particular uses to which the appropriated money is to be put have not been specified, is without merit. The provision of the Constitution (cl. 7, § 9, Art. I) that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law" was intended as a restriction upon the disbursing authority of the Executive department, and is without significance here. It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress. *Reeside* v. *Walker,* 11 How. 272, 291; 2 Story on the Constitution (4th ed.), §§ 1348, 1349; 1 Willoughby on the Constitution, § 63, p. 105. We deem it unnecessary to elaborate the point. The petitions for certiorari, filed in January of the present year, inform us that none of the proceeds of the tax in question has been transmitted to the Philippine Treasury. Evidently the moneys in the form of a trust fund, as the government asserts, are still in the Treasury of the United States. If Congress has not made an appropriation, it may still do so (*Head Money Cases,* 112 U. S. 580, 599–600); and, all other considerations aside, the interjection of the question into the present cases is premature.

The validity of the act disposing of the tax is also attacked as constituting an unlawful delegation of legislative power. That Congress has wide discretion in the matter of prescribing details of expenditures for which

it appropriates must, of course, be plain. Appropriation and other acts of Congress are replete with instances of general appropriations of large amounts, to be allotted and expended as directed by designated government agencies. A striking and pertinent example is afforded by the Act of June 17, 1902, c. 1093, 32 Stat. 388, where all moneys received from the sale and disposal of public lands in a large number of states and territories are set aside as a special fund to be expended for the reclamation of arid and semi-arid lands within those states and territories. The expenditures are to be made under the direction of the Secretary of the Interior upon such projects as he may determine to be practicable and advisable. The constitutionality of this delegation of authority has never been seriously questioned. See *United States* v. *Hanson,* 167 Fed. 881, 884–885. In the present case, the disposition of the proceeds of the tax finds precedent in many previous acts of Congress providing for payments into the Philippine Treasury.*

But all this aside, the important point is that Congress was here dealing with a dependency for which it had provided a complete system of government to administer the affairs of a population for whose welfare the United States was under a high degree of moral responsibility, as we already have seen. The proceeds of the tax under consideration are to be paid into the treasury of a government which Congress itself thus created, to be expended by that government, except as the act otherwise directs, in accordance with its judgment as to specific necessities. The congressional power of delegation to such a local government is and must be as comprehensive as the

---

*Act of March 8, 1902, c. 140, 32 Stat. 54; Act of August 5, 1909, c. 6, 36 Stat. 11, 84–85; Act of October 3, 1913, c. 16, 38 Stat. 114, 193; Act of September 21, 1922, c. 356, 42 Stat. 858, 935; Act of June 17, 1930, c. 497, 46 Stat. 590, 686.

needs. Compare *United States* v. *Heinszen & Co.,* 206 U. S. 370, 384–385. In dealing with the territories, possessions and dependencies of the United States, this nation has all the powers of other sovereign nations, and Congress in legislating is not subject to the same restrictions which are imposed in respect of laws for the United States considered as a political body of states in union. *Dorr* v. *United States,* 195 U. S. 138, 140, 142.

Congress has power to create a local legislature for the Philippines; and it has done so. Congress has power to authorize the legislature to impose taxes for all the lawful needs of the islands, and to appropriate the proceeds for such uses and in such amounts as the legislature may determine (compare *Leitensdorfer* v. *Webb,* 20 How. 176, 182); and this it has done. Congress has power to appropriate the moneys here in question, and cause them to be paid from the national treasury into the Treasury of the Philippine Islands; and for this it has provided. It would result in a strange anomaly now to hold that Congress had power to devolve upon the Philippine Government the authority to appropriate revenue derived from local taxation as the government saw fit, but that Congress was without power to confer similar authority in respect of moneys which lawfully will come into the Philippine Treasury from the Treasury of the United States or from other sources apart from taxation. It is true, as already appears, that the uses to which the money is to be put are not specified. But in all instances where funds shall come into the Philippine Treasury, we may indulge the presumption, in favor of a responsible and duly-constituted legislative body, that the funds will be appropriated for public purposes and not for private uses.

Whether the payment to the Philippines of the large sums of money which will flow from this tax is unwarranted in fact; whether the present or prospective needs

of the islands require it; and other queries directly or indirectly challenging the wisdom or necessity of the Congressional action, are all matters, as we repeatedly have pointed out, with which the courts have nothing to do. We find the legislation to be free from constitutional infirmity; and there both our power and responsibility end.

*Judgments affirmed.*