**UNITED BISCUIT COMPANY OF AMER-
ICA, Appellant,**

v.

**W. Willard WIRTZ, Secretary of Labor,
et al., Appellees.**

**No. 18489.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 28, 1965.

Decided Nov. 19, 1965.

Petitions for Rehearing En Banc and
before the Division Denied
Jan. 20, 1966.

Certiorari Denied June 6, 1966.
See 86 S.Ct. 1861.

Mr. Ralph Earle, II, Philadelphia, Pa., of the Bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Mr. William J. Curtin, Washington, D. C., was on the brief, for appellant. Mr. Richard C.

Hotvedt, Washington, D. C., also entered an appearance for appellant.

Mr. Robert V. Zener, Atty., Dept. of Justice, with whom Asst. Atty. Gen. John W. Douglas, Messrs. David C. Acheson, U. S. Atty., at the time the brief was filed, and Sherman L. Cohn, Atty., Dept. of Justice, were on the brief, for appellees.

Mr. Howard Lichtenstein, New York City, filed a brief on behalf of the National Biscuit Company, as amicus curiae, urging reversal.

Before BAZELON, Chief Judge, and WASHINGTON and WRIGHT, Circuit Judges.

WASHINGTON, Circuit Judge:

This action challenges the validity of a determination by the Secretary of Labor that appellant United Biscuit Company violated the overtime provisions of the Walsh-Healey Public Contracts Act, 49 STAT. 2036 (1936), as amended, 41 U.S.C. §§ 35–45 (1958).

The facts in this case are not in dispute. In 1957, appellant and the Government, represented by the Military Subsistence Supply Agency (MSSA), entered into a written agreement, known as a Purchase Notice Agreement. Under the Agreement, appellant provided the MSSA with a list of some of its products and offered to sell the specified items to the Government at the prices listed, or at any lower price that appellant might offer to any other purchaser. The MSSA, in return, agreed to distribute these price lists to all commissaries and other military installations and promised that purchases made with appropriated funds by military installations in the continental United States for the purpose of resale would be made directly from appellant under the Agreement, not through middlemen. The Agreement was terminable after due notice by either party to the contract. Subsequently, the Government placed and the appellant filled a number of orders under the Purchase Notice Agreement. Although the total amount of purchases was quite large, no single order exceeded $10,000 in amount. Appellant was not given ex-plicit notice by the MSSA that the Walsh-Healey Public Contracts Act was considered applicable to the Purchase Notice Agreement at the time it entered into the arrangement. However, on October 30, 1959, appellant received a letter from MSSA advising that the Act was thought to apply to the Agreement. On January 6, 1960, the Department of Labor initiated a proceeding against appellant, charging violations of the Walsh-Healey Act. The Secretary of Labor found that the Purchase Notice Agreement was subject to the Walsh-Healey Act and that appellant had violated the Act by not paying certain of its employees time and one-half for hours worked in excess of eight on any day or forty in any week. Appellant brought suit in the District Court and that court sustained the Secretary's determination. This appeal followed.

The central issue in this case is whether the Purchase Notice Agreement is a "contract made and entered into by any executive department * * * for the manufacture or furnishing of materials, supplies, articles, and equipment in any amount exceeding $10,000 * *" under the Walsh-Healey Act, 41 U.S.C. § 35. The Walsh-Healey Act was passed in 1936 in an effort "to use the leverage of the Government's immense purchasing power to raise labor standards," Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 507, 63 S.Ct. 339, 342, 87 L.Ed. 424 (1943), and "to obviate the possibility that any part of our tremendous national expenditures would go to forces tending to depress wages and purchasing power and offending fair social standards of employment." Perkins v. Lukens Steel Co., 310 U.S. 113, 128, 60 S.Ct. 869, 877, 84 L.Ed. 1108 (1940). See also George v. Mitchell, 108 U.S.App.D.C. 324, 282 F.2d 486 (1960). The basic design of the Act is quite simple: to force suppliers and manufacturers doing business with the Government to observe minimum labor and wage standards by the insertion in Government contracts of the representations and stipulations contained in Section 35. Violation of these representations and stipulations renders the con-

tracting party liable for damages and, possibly, for black-listing from Government contracts for a three-year period. 41 U.S.C. §§ 36 and 37.

Appellant argues that the Purchase Notice Agreement is not a contract, but merely a continuing offer. In the alternative, appellant contends that even if the Agreement is a valid contract, it is not a "contract * * * for the manufacture or furnishing of * * * supplies" within the meaning of the Act. Because under the terms of the Purchase Notice Agreement the Government is not obligated to order any products and appellant is not obligated to furnish any, appellant argues that the plain meaning of the words of the statute compels the conclusion that the Act does not apply to the Purchase Notice Agreement. We are not so persuaded.

The Purchase Notice Agreement, which is the subject of this suit, is an enforcible contract at common law; it is in the nature of a bilateral option contract. Each party has made certain promises, and these promises constitute consideration adequate to support the promises of the other party. Mutuality of obligation is not lacking. 1A CORBIN, CONTRACTS §§ 152, 157 (1963).[1] The fact that the parties to the Agreement denominated the writing as a "continuing offer" is not germane to the question presented by this case. Nor, for the same reason, is the fact that the Agreement is in the nature of an option contract rather than of a contract for the sale of specific goods dispositive. We are not faced with a problem of classifying the Agreement under the familiar categories of the common law, nor of ascertaining the parties' intent in establishing their relationship. The case presents a question of statutory interpretation, and the answer must be found in the language and policy of the Act: what did Congress mean by the phrase "contract * * * for the * * * furnishing of * * * supplies"?

The Walsh-Healey Act was designed by Congress to create a broad remedial scheme applicable to all significant Government procurement of supplies, equipment and machinery.[2] When Congress desired to exempt certain kinds of procurements from the Act, it did so explicitly. See 41 U.S.C. § 43. We must thus start with the presumption that Congress intended the Act to cover all regular and institutionalized methods of purchase used by the Government resulting in large scale acquisitions of material and supplies from the private sector of our economy. Appellant is one of the three largest manufacturers of cookies and biscuits in the United States and its sales represent a significant percentage of the total biscuit and cookie market in this country. The Agreement covered all military installations in the United States, and purchases for military installations abroad were also permitted under its terms. The Supply Bulletin distributed pursuant to the Agreement listed some 175 items which might be purchased from 12 different divisions of appellant. In a little over two years appellant sold the Government $253,472.34 worth of goods from its Norfolk, Virginia, branch alone. Given these facts, most of which were known at the time the Agreement was signed, it is apparent that both parties to the contract must have contemplated that large scale Government procurements would be made under the Agreement.[3] In addition, it appears obvious that Congress must have

1. Thus, we need not reach the question of whether an agreement between the Government and a private supplier must be legally enforcible for it to be regarded as a contract subject to the Walsh-Healey Act.

2. See, e.g., 80 CONG.REC. 10004-07 (1936) (remarks of Representatives Duffy, Michener, and Wadsworth).

3. We are at least certain that appellant hoped to sell the Government large quantities of its products and worked hard to achieve that end. Moreover, given the variety and widespread popularity of appellant's goods, the Gvernment could have anticipated that its commissaries, which service the needs of military households, would purchase substantial amounts of appellant's cookies and biscuits.

desired the Walsh-Healey Act to reach requirement contracts. Yet, such contracts differ from the Agreement in this case only in that under a requirements contract the Government would be obligated to make purchases. Where, as in this case, the context of a contract leaves no doubt that the Government contemplated large purchases and where such purchases actually occurred, it would be anomalous, in light of the policy of the Act, to differentiate between the two kinds of contracts. In both cases large procurements would be made during the course of an on-going commercial relationship, in both the type of goods to be purchased and their price would be specified, and in both the effect, if any, of the contract upon the wages and working conditions of the seller's employees and upon labor conditions in general would be identical. In sum, to exclude from the scope of the Act contracts, such as the Purchase Notice Agreement, which created a continuing commercial relationship of a sizeable, but indefinite, amount would defeat congressional policy.[4] We thus conclude that the Purchase Notice Agreement is a contract for the furnishing of supplies within the meaning of Section 35.

■ The question then becomes whether the Purchase Notice Agreement is a "contract * * * in any amount exceeding $10,000." 41 U.S.C. § 35. Appellant relies on the fact that no single order under the Agreement totalled over $10,000. This argument, however, ignores the basic purpose of the Act—to control all large scale purchases by the Government which might adversely affect labor conditions. It seems clear that at the time the Agreement was signed, the parties must have anticipated that the total amount of the supplies to be furnished would be in excess of $10,000, and subsequent events more than justified their expectations. Moreover, the Agreement itself specified the price of the items offered by appellant;[5] these price quotations, in turn, presumably controlled in large part the amount appellant could afford to pay those of its employees who worked on Government orders. As far as appellant was concerned, the Purchase Notice Agreement itself, not the orders thereunder, was the document which primarily determined its wage and employment policies. Treating all of the orders as units or subcontracts[6] under the Agreement, therefore, would conform to the realities of the business situation and, by looking to the document which affected appellant's labor practices, would effectuate the purposes of the Act. Nor would aggregating the individual orders frustrate the rationale behind the $10,000 minimum of the Act.[7] Thus,

---

4. Congress did not limit the Act to contracts for the sale of a particular amount of goods at a particular time or place. If any inference is to be drawn from the statutory reference to contracts for the furnishing of supplies, it is that Congress sought as inclusive a term as possible.

5. In fact, no list of items and prices was attached to the Purchase Notice Agreement. A Supply Bulletin was issued pursuant to the Agreement, however, and it contained the price list that should have been appended to the Agreement. This list has been treated as the one provided for by the Agreement throughout this litigation.

6. The Purchase Notice Agreement, and Form 32, which was incorporated therein, occasionally referred to the contemplated orders as "subcontracts." This usage was not consistent, however, and it is im-

possible to say whether it was the result of careless drafting or of a conscious effort by the parties to the contract to describe the relationship between the Agreement and the individual orders for specific goods.

7. As we recognized in George v. Mitchell, supra, 108 U.S.App.D.C. at 331, 282 F. 2d at 493, "the $10,000 minimum was designed both to enable small manufacturers to obtain Government contracts and to avoid administrative burdens." A further explanation, suggested by the congressional debate over the Walsh-Healey Act, was that small and casual contracts would not have a significant depressant effect upon wages and conditions of employment within a given industry or the country as a whole. See 79 CONG. REC. 12779 (1935) (remarks by Senator Hastings). As we have

using the policies of the Walsh-Healey Act as our guide, we conclude that the Purchase Notice Agreement between appellant and the Military Subsistence Supply Agency falls within the coverage of the Act.[8]

 Appellant further argued in the District Court that the Purchase Notice Agreement came within the open market exception of the Walsh-Healey Act, 41 U.S.C. § 43, which states that the Act does not "apply to purchases of such * * * supplies * * * as may usually be bought in the open market."[9] The fact that the Purchase Notice Agreement was entered into pursuant to the Armed Services Procurement Act of 1947, 62 STAT. 21, as amended, 10 U.S.C. §§ 2301–2314 (1958), takes it out of the ambit of the exception.[10] Although that Act authorizes certain purchases to be made by negotiation, the open-market exception of the Walsh-Healey Act is suspended insofar as such purchases are concerned. 10 U.S.C. §§ 2304(a) (8) and 2304(f).

 Appellant, however, urges that the purchases made under the Purchase Notice Agreement were not within the Armed Services Procurement Act, since that Act applies only to purchases made with appropriated funds. 10 U.S.C. § 2303(a).[11] Military Commissary purchases are made with moneys drawn on

---

pointed out, the Purchase Notice Agreement in this case was by no means a small contract whether it is viewed retrospectively or from the vantage point of the parties when it was negotiated. Nor would aggregating the individual orders place an undue administrative burden on the Government or appellant. From the Government's point of view, large scale procurement was contemplated and occurred; this was not a case of small, isolated or haphazard dealings with a contractor. See, e.g., Hearing on S.3055 Before the Senate Committee on Education and Labor, 74th Cong., 1st Sess. 18–19 (1935); Hearing Before a Subcommittee of the House Committee on the Judiciary, 74th Cong., 2d Sess., Ser. 12, Pt. 2, at 165–170 (1936). From appellant's perspective, the situation was not different from that which would be faced under a requirements contract or under a large order to be delivered in small quantities to various installations over a long period of time. Finally, appellant is in no position to claim that it is a small business deserving of lower standards in order to obtain Government contracts.

8. We also note that the Department of Labor's interpretation of the Walsh-Healey Act is in accord with the position we have taken in this case. In the Rulings and Interpretations now in effect, 2 CCH Labor Law Rep. (Wages-Hours) ¶ 26,300.003, and in a line of decisions in the Public Contracts Division, it has been held that contracts under which the Government has the option to purchase more than $10,000 worth of supplies are covered by the Act. See, e.g., Anderson and Cristofani, 9 Wage & Hour Cas. 86 (Per Administrator, 1949); Euler Lime Co., 10 Wage & Hour Cas. 176 (Per Administrator, 1951). Indeed, the Public Contracts Division has held that the Walsh-Healey Act is applicable to a Purchase Notice Agreement apparently similar to that of the instant case. Funsten Co., 13 Wage & Hour Cas. 242 (Per Hearing Examiner, 1957), aff'd, 13 Wage & Hour Cas. 819 (Per Administrator, 1958).

9. Appellant did not rely on this defense during the course of the administrative proceeding. It was first raised by appellant's amendment to its complaint in the District Court filed on February 14, 1961.

10. The only statute which has been identified as possibly authorizing the Purchase Notice Agreement is the Armed Services Procurement Act of 1947. The Military Subsistence Supply Agency relied upon this statute for authority to enter into the Agreement. Moreover, the legislative history of the Procurement Act indicates that Congress intended it to be as comprehensive as possible—to apply to all procurements of supplies and equipment by every branch of the armed forces. Finally, it is clear that Congress expressly designed one subsection of the Act, Section 2304(a) (8), to permit commissary purchases of brand-name items. H.R.REP.No. 109, 80th Cong., 1st Sess. 8 (1947); S.REP.No. 571, 80th Cong., 1st Sess. 7 (1947). Thus, we must begin our inquiry with the assumption that, unless shown otherwise, the Act governed and authorized the purchases in question.

11. We see no impropriety in the District Court's remanding the case to the Secretary of Labor for further findings on the

the Treasury from what are known as "stock funds." Creation of these stock funds was first authorized by Section 405 of the National Security Act Amendments of 1949.[12] The stock funds were established in order to provide more efficient controls over the cost and size of virtually all military expenditures. As inventory or supplies are used, a charge is made against the appropriate fund. The fund is then credited with appropriations or other moneys in order to replace the supplies. In the case of commissaries, all purchases of goods by the commissary, including those made under the Purchase Notice Agreement in this case, are paid for out of a stock fund. The money received for the goods on resale to the military consumer is then credited to the stock fund.

Appellant seizes on this method of financing and argues that the money paid it for its goods came not from appropriated funds, but from the consumer's pocket. Appellant analogizes the stock fund to a regular bank account and argues that the court should "trace" the money to the consumers who paid the commissaries for the goods. We find no merit in appellant's contentions.

It appears that prior to passage of Section 405, commissary purchases were made from appropriated funds,[13] and the legislative history of that section fails to disclose a congressional purpose to alter the source of funds for such purchases. Rather, Congress apparently assumed that commissary purchases were still to be made from appropriated funds. The provision for a revolving fund, replenished by the proceeds from commissary sales, was apparently considered an administrative convenience. It eliminated the need for a new appropriation each fiscal year by creating what was, in effect, an on-going appropriation. See S.Rep.No. 366, 81st Cong., 1st Sess. 11–20 (1949); H.Rep.No. 1064, 81st Cong., 1st Sess. 6–11 (1949); H.Rep.No. 790, 82nd Cong., 1st Sess. 116 (1951). Long standing administrative rulings and practice support this interpretation of Section 405. The Comptroller General, in the past, has ruled that the establishment of a revolving fund, replenished by moneys from the public, constitutes an on-going appropriation which does not have to be renewed each year. 1 Comp.Gen.Decs. 704 (1922). And the armed services have conducted their

---

question of whether the funds were appropriated. Since appellant did not argue the applicability of the open-market exception, the Government had no obligation to prove its inapplicability in the original hearing. Indeed, there is some question about the propriety of appellant's raising in the District Court a legal theory not presented to the agency.

12. "Sec. 405. (a) In order more effectively to control and account for the cost of programs and work * * * the Secretary of Defense is authorized to require the establishment of working-capital funds * * *.

 * * * * *

 "(c) Such funds shall be—
 "(1) charged, when appropriate, with the cost of stores, supplies, materials, and equipment procured. * * *
 "(2) reimbursed from available appropriations or otherwise credited for the cost of stores, supplies, materials, or equipment furnished * * *.
 "(d) The Secretary of Defense is authorized to provide working-capital * * * by capitalizing inventories on hand and

* * * by transfer * * * from unexpended balances of any appropriations of the military departments * * *. To the extent that such methods do not * * * provide adequate amounts of working capital, there is hereby authorized to be appropriated, out of any moneys in the Treasury not appropriated for other purposes, such sums as may be necessary to provide adequate working capital." 63 Stat. 578, 587–88 (1949).
The current version of this statute may be found at 10 U.S.C. § 2208 (Supp. V, 1959–63).

13. For example, when Congress passed the Armed Services Procurement Act, it specifically authorized commissary purchases of brand-name items without competitive bidding. 10 U.S.C. § 2304(a) (8). Congress, in 1947, thus understood that commissary purchases were made from appropriated funds within the meaning of 10 U.S.C. § 2303(a). See S.Rep.No. 571, 80th Cong., 1st Sess. 7 (1947); H.Rep. No. 109, 80th Cong., 1st Sess. 8, 18 (1947).

entire purchasing program for commissaries under the belief that moneys paid out of the stock funds were appropriated. Finally, the Supreme Court has recently stated, during the course of an opinion, that all commissary purchases are made from appropriated funds within the meaning of Section 2303(a). Paul v. United States, 371 U.S. 245, 261–263, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). Although these statements might be viewed as dicta, they were essential to the logic of the majority opinion, and they were not rejected by the vigorous and careful dissent in the case. Even if these statements are not binding, they are quite persuasive. We thus conclude that the moneys paid by the Treasury to appellant out of the various military stock funds constituted "appropriated funds" within the meaning of Section 2303(a).[14]

We recognize that it is somewhat harsh to apply the Walsh-Healey Act to a situation in which the contracting party was not given full notice of the statute's applicability at the time of contracting. If the Act is found applicable, appellant will be subject to liquidated damages of about $3,500, and it may be "black-listed" from receiving Government contracts for three years. 41 U.S.C. § 37. However, the record indicates that since appellant acted in good faith, it would not be black-listed upon prompt payment of the liquidated damages.

Probably as important from appellant's point of view is the disruption that would be caused to its existing labor policies by an adverse decision. The Purchase Notice Agreement does, however, incorporate by reference the representations and stipulations that are required by the Walsh-Healey Act, if it is applicable to the contract; appellant was thus put on notice. In addition, an unbroken line of administrative decisions by the Public Contracts Division of the Labor Department, strongly suggesting that the Act was applicable to the Purchase Notice Agreement, was a matter of public record in 1957. See cases cited in footnote 8, *supra*. More significantly, the Portal-to-Portal Act of 1947, 61 STAT. 89 (1947), 29 U.S.C. § 259 (1958), provides a Government contractor with a certain method of determining the applicability of the Act to its transactions with the Government. Appellant has not availed itself of this procedure;[15] hence, its reliance on the Defense Department's

14. Further support for our conclusion comes from the well worn, but still valid, maxim that Government actions are to be presumed lawful. The United States Constitution, Article I, Section 9, Clause 7, provides that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." The proceeds from all sales made by the commissaries in question were paid into the United States Treasury and appellant was paid by Treasury check, charged to the appropriate military stock fund. To deny that the commissary purchases were made with appropriated moneys would be tantamount to declaring that the payments to appellant from the Treasury, and an unknown portion of the entire military procurement program, were unconstitutional. See, *e.g.*, Reeside v. Walker, 52 U.S. (11 How.) 272, 291, 13 L.Ed. 693 (1850); Cincinnati Soap Co. v. United States, 301 U.S. 308, 321, 57 S.Ct. 764, 81 L.Ed. 1122 (1937). Indeed, the issue of whether Government purchases are made within the bounds of this constitutional requirement may ap-

proach that category of legal problems known as "political questions." A contrary decision in this case would apparently trench upon the prerogatives of the executive and legislative branches and would raise serious problems of "separation of power." Moreover, it would seem impossible in this connection for a court to establish workable criteria by which to distinguish those acts of Congress which created valid appropriations from those which did not.

15. Apparently, the Administrator of the Division of Public Contracts sent a letter to National Biscuit Company in 1943 stating that a Purchase Notice Agreement would not be considerd a contract for the furnishing of supplies within the meaning of the Walsh-Healey Act. Appellant, however, never claimed reliance on this letter, nor was this letter introduced as an exhibit in the instant case. Thus, we will not consider what effect it might have in a similar case brought by different parties.

or on its own interpretation of the Walsh-Healey Act is no defense to this action. Cf. United States v. Stocks Lincoln-Mercury, Inc., 307 F.2d 266 (10th Cir. 1962).

Appellant's other contentions have been given due consideration, but we find no basis for overturning the District Court's decision.

Affirmed.

Danaher, Burger, and Tamm, Circuit Judges, and Miller, Senior Circuit Judge, dissented in part.