

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-10-2004

# Local 1647 v. FLRA

Precedential or Non-Precedential: Precedential

Docket No. 03-4553

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Local 1647 v. FLRA" (2004). *2004 Decisions*. Paper 108.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/108

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-4553

———

AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO, LOCAL 1647,

Petitioner

v.

FEDERAL LABOR RELATIONS AUTHORITY

———

On petition for review of an order of the
Federal Labor Relations Authority
0-NG-2697, 59 FLRA No. 51

———

Argued: October 1, 2004

Before: ROTH and CHERTOFF *Circuit Judges*, and
IRENAS,[*] *Senior District Judge*.

(Filed November 10, 2004)

MARTIN R. COHEN (Argued)
AFGE, Suite 117
10 Presidential Blvd.

———

[*] Honorable Joseph E. Irenas, Senior United States District Judge
for the District of New Jersey, sitting by designation.

1

Bala Cynwyd, PA 19004
*Counsel for Petitioner*

DAVID M. SMITH, Solicitor
WILLIAM R. TOBEY, Deputy Solicitor
DAVID M. SHEWCHUK, Attorney (Argued)
Federal Labor Relations Authority
1400 K Street, N.W., Suite 300
Washington, D.C. 20424
*Counsel for Respondent*

————

OPINION OF THE COURT

————

CHERTOFF, *Circuit Judge.*

Petitioner, Local 1647 of the American Federation of Government Employees ("AFGE" or the "union"), proposed a contractual provision that would have allowed employees at the Tobyhanna Army Depot ("TYAD") to be reimbursed from the TYAD Army Working Capital Fund ("AWCF") for personal expenses they sustained as a result of cancelled annual leave. Respondent Federal Labor Relations Authority ("FLRA") held the proposal was nonnegotiable because it would require an impermissible expenditure of congressionally appropriated funds. The FLRA specifically rejected the AFGE's sole argument, which was that most of the money in the AWCF does not consist of appropriated funds because the AWCF is in large part financed through collections from customers to whom TYAD sells services. Petitioner sought review.

Resolution of this issue turns on the definition of appropriated funds. The question of when agency funds are defined as "appropriated" has important legal implications going to the heart of Congress' power to control the financial activities and expenditures of the Executive Branch.

For the reasons set forth in this opinion, we determine that AWCF's money is properly considered appropriated funds, and we will affirm the decision of the FLRA.

2

## I.

TYAD is the Defense Department's largest full-service electronic maintenance and repair facility, and is located in Tobyhanna, Pennsylvania. Civilian employees are represented by AFGE. TYAD is financed by a defense working capital fund – the TYAD AWCF. Defense working capital funds like the AWCF are continually replenished with money paid by outside federal agencies and private businesses for the purchase of defense agency goods and services. Additionally, defense working capital funds receive direct annual appropriations from Congress when required. See, e.g., National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 302, 117 Stat. 1392 (2003).

In 2002, the union and TYAD management discussed a proposed amendment to their collective bargaining agreement that would have provided for reimbursements of any documented financial losses suffered by an employee because of a cancellation of annual leave. Under the proposal, an employee whose leave was cancelled by TYAD would be reimbursed for forfeited airline tickets, hotel deposits, and the like. The proposal specifically suggested that the reimbursement would be "from other than appropriated funds." This presumably referred to the assumption that AWCF revenues from services performed for other agencies and businesses were not appropriated funds, and therefore not subject to the legal requirement that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).

Ultimately, TYAD rejected the union proposal on the ground that it was inconsistent with the law, because payment of personal costs is not within the scope of TYAD's authorized appropriations.[1] The union appealed to the FLRA. Before the Authority, the AFGE conceded that the statute governing the TYAD AWCF does not authorize using appropriated money to reimburse employees for personal expenses lost because of

---

[1] Under 5 U.S.C. § 7117(a)(1), "the duty to bargain in good faith . . . [applies] to the extent not inconsistent with any Federal law. . .."

3

government action. (App. 3-4, 83-84.) But, the union argued, the AWCF is a revolving fund, meaning that its outflows of money are replenished by income from billings to the TYAD's customers. Thus, the union urged, although appropriated funds could not be used to pay for personal out-of-pocket losses, TYAD could draw on its sales revenues because these were not appropriated funds.[2]

The FLRA upheld the determination that the AFGE's reimbursement proposal was improper. The Authority reasoned that as a revolving fund the AWCF should be treated, as a matter of law, as an "on-going or continuing appropriation." (App. 4.)[3] Given the union's acknowledgment that the AWCF statute did not authorize appropriated funds to be spent for personal reimbursements, the FLRA concluded that the union's proposal would violate 31 U.S.C. § 1301(a), and therefore was not a proper subject for collective bargaining under 5 U.S.C. § 7117.

We have jurisdiction over this petition for review under 5 U.S.C. § 7123(a). We review the FLRA's decision under the standards of the Administrative Procedure Act. See 5 U.S.C. § 7123(c) (incorporating 5 U.S.C. § 706). Because the question here is whether the FLRA decision is an improper interpretation of statutes governing the AWCF, our review is plenary, and we follow the agency's interpretation only insofar as its reasoning is "sound." Ass'n of Civilian Technicians, Tex. Lone Star Chapter 100 v. FLRA, 250 F.3d 778, 782 (D.C. Cir. 2001).

---

[2] After briefs were submitted and at oral argument, the AFGE sought to take the position that even if the AWCF funds were appropriated, the governing statute would allow use of that appropriated money to reimburse lost personal expenses. Letter pursuant to Rule 28(j), September 30, 2004. Because that was not the union's position before the Authority, we decline to allow the union to switch horses for this appeal. See 5 U.S.C. 7123(c) ("No objection that has not been urged before the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances.").

[3] The FLRA opined that a revolving fund is created not to step outside the appropriations process, but as a means by which TYAD was relieved of the ordinary requirement that appropriated funds be spent in the same fiscal year. (App. 4.)

II.

A.

One of the fundamental powers lodged by the Constitution in the Congress is control over the expenditure of public money. The Appropriations Clause provides:

> No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

U.S. Const. Art. I, § 9, Cl. 7.

For purposes of the appropriations power, public money is defined broadly. As Justice Story observed in his Commentaries, it includes "all the taxes raised from the people, as well as revenues arising from other sources." 2 Joseph Story, Commentaries on the Constitution of the United States § 1348 (3d ed. 1858), quoted in Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 427 (1990). By law, public money includes money from any source such as taxes, customs and user fees, and other proceeds of government agency activities. See 31 U.S.C. § 3302 (Miscellaneous Receipts Act). The purpose of the Clause is to place authority to dispose of public funds firmly in the hands of Congress, rather than the Executive. Richmond, 496 U.S. at 425-27; Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937). This not only allows Congress to guard against "extravagance," Story, supra, but hands the Legislative Branch a powerful tool to curb behavior by the Executive. See generally Kate Stith, Congress' Power of the Purse, 97 Yale L.J. 1343 (1988). Without congressional permission, therefore, no money may be paid by the Treasury. Richmond, 496 U.S. at 427-28; Reeside v. Walker, 52 U.S. (11 How.) 272, 291 (1850) (alternate holding).

Congress itself may choose, however, to loosen its own reins on public expenditure. So, for example, although Congress ordinarily requires that appropriations be spent within a single

5

year, it may also authorize appropriations that continue for a longer period of time. See Nat'l Ass'n of Reg'l Councils v. Costle, 564 F.2d 583, 587 & n.10 (D.C. Cir. 1977). Congress may also decide not to finance a federal entity with appropriations, thereby giving rise to what is described as a nonappropriated fund instrumentality or NAFI. See United States v. Hopkins, 427 U.S. 123, 125 n.2 (1976); 10 U.S.C. §§ 4779(b), 9779(b). NAFI entities are "arms of the [federal] government," Standard Oil Co. v. Johnson, 316 U.S. 481, 485 (1942), but their "monies do not come from congressional appropriation but rather primarily from [their] own activities, services, and product sales." Cosme Nieves v. Deshler, 786 F.2d 445, 446 (1st Cir. 1986).

What distinguishes a NAFI from other federal entities that are financed through the normal appropriations process? Under the case law, the test is not simply whether the organization in question receives payments from its own activities, but whether the organization is "denied by the Government any use of appropriated monies." L'Enfant Plaza Props, Inc. v. United States, 668 F.2d 1211, 1212 (Ct. Cl. 1982); see also Hopkins, 427 U.S. at 125 & n.2. Since the power to appropriate belongs to Congress, see Richmond; Cincinnati Soap, 301 U.S. at 321, Congress must make the decision whether to allow or deny a federal instrumentality appropriated funds. Congress may impose the restriction that the instrumentality be entirely self-supporting, without any appropriated funds, in which case it is a NAFI. See, e.g., Core Concepts of Florida, Inc. v. United States, 327 F.3d 1331 (Fed. Cir. 2003) (Federal Prison Industries is a NAFI); Furash & Co. v. United States, 252 F.3d 1336 (Fed. Cir. 2001) (Federal Housing Finance Board is a NAFI). Or, Congress may direct an entity to be self sufficient, but leave open the possibility that appropriations may be applied. See, e.g., L'Enfant Plaza, 668 F.2d at 1212 (financial self-sufficiency does not establish NAFI where historically appropriations were received and are allowed under the statute for the future); Slattery v. United States, 53 Fed. Cl. 258 (Fed. Cl. 2002) (FDIC Bank Insurance Fund is not a NAFI because Congress expressed willingness to appropriate funds, although it never has). Whether an agency or agency fund is a NAFI is determined by looking at the entirety of its financial wellspring, not by parsing

6

its revenue stream to determine which moneys came from the Treasury and which from customer payments. Indeed, an entity is not treated as a NAFI even if all of its money flows from its own activities, and even if appropriated funds have never been used, so long as "under the agency's authorizing legislation Congress could appropriate funds if necessary." L'Enfant Plaza, 668 F.2d at 1212.

As our review of authority suggests, most of the analysis of the line between appropriated funds and NAFIs has been undertaken by the Federal Circuit, the United States Court of Federal Claims, and its predecessor courts. That is understandable, since under the Tucker Act, 28 U.S.C. § 1491, judgments against the United States are paid from appropriated funds, so that the claims courts' jurisdiction often depends on whether the defendant to a claim is a NAFI. In considering whether an organization's funds are appropriated or not, the Federal Circuit has adopted a clear-statement test, presuming that funds disbursed by an entity should be treated as appropriated unless there is "a clear expression by Congress that the agency was to be separated from general federal revenues." L'Enfant Plaza, 668 F.2d at 1212; see also Core Concepts, 327 F.3d at 1334; Research Triangle Inst. v. Bd. of Governors of the Fed. Reserve Sys., 132 F.3d 985, 988 (4th Cir. 1997) (applying same test).

While that "clear expression" standard arises in the context of Tucker Act jurisprudence, we think it accurately reflects the broader principle that one should not lightly presume that Congress meant to surrender its control over public expenditures by authorizing an entity to be entirely self-sufficient and outside the appropriations process. There is a powerful reason for this assumption. At bottom, Congress' decision to treat an agency's funds as appropriated or nonappropriated is not simply a selection of the anticipated source of the funds, but a political decision about how tightly Congress wants to supervise the spending decisions of the agency and whether it wants to stand behind the agency with the full faith and credit of the Treasury. See Slattery, 53 Fed. Cl. at 273 (holding the FDIC Bank Insurance Fund appropriations because Treasury stands behind Fund as last resort). When Congress establishes a NAFI, it insulates the public fisc but also

7

may surrender some degree of control over the entity's spending.[4] Otherwise, Congress reserves its traditional full measure of appropriations power in funding an executive agency. For this reason, the courts have sensibly treated agency money as appropriated even when the agency is fully financed by outside revenues, so long as Congress has not clearly stated that it wishes to relinquish the control normally afforded through the appropriations process. And, in fact, Congress itself has signaled how jealously it guards the appropriations prerogative by imposing a similar "clear statement" rule regarding when a court may find that an appropriation has been made. 31 U.S.C. § 1301(d) ("A law may be construed to make an appropriation . . . only if the law specifically states that an appropriation is made . . . .").

B.

The TYAD AWCF is a defense working-capital fund authorized by statute, 10 U.S.C. § 2208. AFGE argues that under the statute, funds like the AWCF are at least in part comprised of nonappropriated funds. Since, as we have explained, Congress must determine whether instrumentalities are supplied with appropriated or nonappropriated money, this question turns on interpretation of § 2208, applying the clear expression and other principles we have described.

Both sides agree that § 2208 authorizes the Secretary of Defense to establish working-capital funds as "revolving funds," i.e., funds in which income from operations is applied to finance operations without regard to fiscal year limitations. (App. 2-3.) AFGE argued before the FLRA that, to the extent the AWCF is largely composed of collections from sales, those collected moneys are not appropriated and are therefore available to pay for purposes other than those specified in the appropriation. TYAD argued, to the contrary, that any revolving fund is by definition just an appropriation that continues past the fiscal year. The Comptroller General evidently agrees with this

---

[4] Of course, Congress may impose separate spending restrictions on a NAFI. See AINS, Inc. v. United States, 56 Fed. Cl. 522, 540 n.29 (Fed. Cl. 2003).

8

characterization. 4 U.S. Gen. Accounting Office, Principles of Federal Appropriations Law, 15-18 to 15-128 (2d ed. 2001) (noting that one of the foundational rules of a revolving fund is that it is an appropriation). And the FLRA adopted the view of the Comptroller General and the TYAD, which is that revolving funds in their entirety are per se "treated as on-going or continuing appropriations." (App. 4.)

We do not agree with the FLRA's blanket generalization that revolving funds are always appropriations. But we also disagree with AFGE that whether revolving funds are not appropriated depends on whether some or all of the revenues flow from sales or services to third parties. Instead, we think the correct rule is that the characterization of a government fund as appropriated or not depends entirely on Congress' expression, whatever the actual source of the money and whether or not the fund operates on a revolving rather than annualized basis.

We turn first to the position of the FLRA. Its decision was ostensibly supported by statements in United Biscuit Co. of America v. Wirtz, 359 F.2d 206, 212-13 & n.14 (D.C. Cir. 1965), and a long line of Comptroller General decisions, see MDB Communications, Inc. v. United States, 53 Fed. Cl. 245, 248-49 (Fed. Cl. 2002). But these authorities are either distinguishable or unpersuasive.

In United Biscuit, the court considered whether purchases for military commissaries were made with appropriated funds for purposes of deciding the applicability of the Walsh-Healey Public Contracts Act, Pub. L. No. 74-846, 49 Stat. 2036 (1936).[5] The court determined that the commissaries were financed through a Treasury Department "stock fund," in which appropriated moneys were spent to purchase supplies and then recouped by the stock fund when the commissaries sold supplies.

_____

[5] As explained in United Biscuit, the Walsh-Healey Public Contracts Act is designed to force suppliers and manufacturers doing business with the government to observe minimum labor and wage standards by the insertion in government contracts of certain representations and stipulations. 359 F.2d at 208. Violation of these representations and stipulations renders the contracting party liable for damages, and, possibly, for blacklisting from government contracts for a three-year period. Id.

Examining the context of the specific statute establishing that funding arrangement, the court accepted the broad view of the Comptroller General that "establishment of a revolving fund, replenished by moneys from the public, constitutes an on-going appropriation which does not have to be renewed each year." 359 F.2d at 212. But while that statement may have been correct and necessary in the particular context of the commisaries' "stock fund," it is dicta – and likely incorrect dicta – with respect to other, different types of revolving funds. The particular structure of the stock fund in United Biscuit mandated that annual appropriations pay for the commissaries' purchases of goods, and that the revenue from sales return to Treasury. See AINS, Inc. v. United States, 56 Fed. Cl. 522, 540 n.29 (Fed. Cl. 2003) (distinguishing United Biscuit). But other revolving funds are designed to stand alone financially, and therefore do not constitute appropriations. Hopkins, 427 U.S. 123 (post exchanges); Furash, 252 F.3d at 1336 (the Federal Housing Finance Board); AINS, 46 Fed. Cl. at 522 (the Mint). Properly read, therefore, the holding of United Biscuit is not that all revolving funds are appropriations, but that it depends on whether the particular revolving fund is financed – or is permitted to be financed – by appropriated funds. That is consistent with our own test.

The FLRA also put considerable weight on the Court of Federal Claims, decision in MDB Communications, and the line of Comptroller General decisions on which it relies. MDB Communications held that a "revolving fund is, in substance, a continuing or permanent appropriation." 253 Fed. Cl. at 248. But the FLRA disregarded the Federal Circuit's later decision in Core Concepts, which expressly held that the Comptroller General's "view that all revolving funds are appropriations is misplaced [in the context of the NAFI doctrine]." 327 F.3d at 1338. MDB Communication's generalized holding about revolving funds, therefore, has been effectively overruled by Core Concepts.

Finally, the FLRA invoked support from a line of opinions by the Comptroller General which assert that revolving funds are necessarily appropriated funds based on the interplay between the Miscellaneous Receipts Act, 31 U.S.C. § 3302(b) – which generally requires money received by the government to

10

be deposited in the Treasury's general fund – and the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7. 4 U.S. Gen. Accounting Office, supra, at 15-81 to 15-128. Essentially, the Comptroller General argues that because Congress normally requires all receipts to flow into the Treasury under § 3302(b), and because all appropriations from the Treasury must be made by Congress under the Appropriations Clause, it follows that all revolving funds are appropriations.

But, as the court in Core Concepts correctly noted, the Comptroller General's premise is flawed. The Miscellaneous Receipts Act need not apply to all government revenues. Congress may choose to treat some agency revenues outside of the general Treasury fund by statutorily authorizing those revenues to be deposited into a special fund. Core Concepts, 327 F.3d at 1338. Having done so, Congress has taken the revenues out of the appropriations cycle. There is, as we have already explained, no Appropriations Clause impediment to Congress relinquishing its own appropriations authority. See Cincinnati Soap, 301 U.S. at 321.

Finally, the Comptroller General's view is inconsistent with Supreme Court precedent. The Comptroller General defines a revolving fund as "a permanent authorization for a program to be financed, in whole or in part, through the use of its collections to carry out future operations." 4 U.S. Gen. Accounting Office, supra, at 15-81 to 15-128. This definition comprehends the funds that traditionally support the military post exchanges. See 10 U.S.C. §§ 4779(b), 9779(b). But in United States v. Hopkins, the Supreme Court described these post exchange moneys as nonappropriated funds, based on the particular statutes authorizing the funds. 427 U.S. at 125 & n.2. The fact that the Supreme Court has recognized that collected moneys can (but need not) be nonappropriated funds completes the demolition of the Comptroller General's position that all revolving funds derived wholly or in part from collections are necessarily appropriated funds.

In short, United Biscuit and Core Concepts reaffirm our principle that each agency fund, whether or not "revolving," must be separately examined under the congressional "clear expression" test to see if it consists of appropriated or nonappropriated money. We disagree with the FLRA's

11

acceptance of the view that the TYAD AWCF revolving fund is necessarily appropriated money.

But that does not mean we adopt the argument of the AFGE that because the AWCF is replenished from customer fees we should treat the AWCF (or some part of it) as nonappropriated. Under the approach we have outlined, what matters is how Congress' wishes to treat government revenue, not the source of the revenue. We examine the particular funding arrangement of the AWCF, therefore, to see whether there is a "clear expression by Congress that it intended to separate the agency from general federal revenues." Furash, 252 F.3d at 1339. If so, it would be a NAFI. But in the case of the defense working-capital funds, Congress has actually expressed the contrary view: that the defense working-capital funds were meant to be supported by appropriated funds.

Section 2208(d), which authorizes the working-capital funds, expressly provides that "such amounts may be appropriated for the purpose of providing capital for working capital funds as have been specifically authorized by law." 10 U.S.C. § 2208(d). Subsection (c) mandates that "[w]orking-capital funds shall be . . . reimbursed from available appropriations or otherwise credited for . . . costs." Thus, the statute suggests that Congress intended to infuse the working-capital funds with appropriated moneys. And, as noted above, Congress has in fact regularly supplemented the capital in the defense working capital funds with direct appropriations. See, e.g., National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 302, 117 Stat. 1392 (2003) (appropriating $632,261,000 for military working-capital funds); Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, § 302, 116 Stat. 2458, 2506 (2002) (appropriating $387,156,000 for military working-capital funds); National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, § 302, 115 Stat. 1012, 1047 (2001) (appropriating $1,656,396,000 for military working-capital funds).

Undoubtedly, therefore, the TYAD AWCF is not a NAFI. Not only has Congress expressly indicated that the working-capital fund may be financed through appropriations, but it has done so repeatedly. Under the "clear expression" test, and the

line of appellate decisions which we have discussed, the moneys in the AWCF are legally appropriated funds.

The AFGE nevertheless advances two arguments in support of its claim that the AWCF is exempt from the statutory restriction on the use of appropriations. First, the union observes that at least some of the money is received from customers, and it urges us to segregate these and treat them as nonappropriated funds. The uniform rule, however, is that the character of an agency's funding is defined as a whole. Slattery, 53 Fed. Cl. at 258. The reason is fundamental. As we have explained, what is at stake in the characterization of agency funds is not merely an accounting of the source of revenue, but a decision about the degree of congressional supervision of agency spending. Where Congress has not "clearly expressed" its decision to create a NAFI, therefore, it has determined that the agency's spending should be subject to the usual appropriations authority even if the Treasury is not the source of all or even any of the funds. AFGE's suggestion that one culls specific money based on whether generated from the Treasury or outside revenues is inconsistent with this conceptual underpinning of the NAFI doctrine, and the judicial precedent.

Second, the AFGE relies on Department of Defense internal accounting rules that separately categorize cash by source: operations, investments, and appropriations. But regulations or rules promulgated by the Executive on its own cannot affect the character of an agency's funds. The purpose of the Constitution's Appropriations Clause is to constrain the Executive and assure Congress' control over expenditures. Congress may choose to relinquish its appropriations authority in specific instances by establishing NAFIs or continuing appropriations, but that is the choice of Congress. Here, Congress has chosen not to give up appropriations authority over the defense working-capital funds. To say that the Defense Department can, on its own, carve out an area of nonappropriated funding would create an Executive prerogative that offends the Appropriations Clause and affects the constitutional balance of powers. This we decline to do.

Accordingly, we believe that the FLRA's decision that the TYAD AWCF consists of appropriated funds was correct, albeit on reasoning somewhat different than that adopted by the

Authority.[6]  The petition for review will be denied.

---

[6] We offer no opinion on the AFGE's belated argument, see supra note 2, that expenditure of appropriated funds to compensate for lost personal expenses is permissible.  That contention can be raised, if appropriate, someplace else. See generally ACT v. FLRA, 370 F.3d 1214 (D.C. Cir. 2004).