**UNITED STATES of America,
Appellant,**

v.

**THURSTON MOTOR LINES,
INC., Appellee.**

**No. 76–2230.**

United States Court of Appeals,
Fourth Circuit.

Argued April 4, 1977.

Decided April 4, 1978.*

---

\* Editor's Note: This case had originally been designated by the Court as not for publication. It is listed at 573 F.2d as a decision without published opinion. The court has now ordered publication.

Miriam R. Eisenstein, Atty., U.S. Dept. of Justice, Washington, D.C. (J. Stanley Pottinger, Asst. Atty. Gen., Walter W. Barnett and John C. Hammock, Attys., U.S. Dept. of Justice, Washington, D.C., and Keith S. Snyder, U.S. Atty., Asheville, N.C., on brief), for appellant.

J.W. Alexander, Jr., Charlotte, N.C. (William L. Auten, Blakeney, Alexander & Machen, B. Irvin Boyle, Boyle, Alexander & Hord, Charlotte, N.C., on brief), for appellee.

Before CLARK, Associate Justice [**], HAYNSWORTH, Chief Judge, and RUSSELL, Circuit Judge.

PER CURIAM:

Executive Order 11246 requires that non-discrimination-in-employment and related clauses be included in all government contracts in excess of $10,000 and in all government bills of lading.[1] Those provisions of the Executive Order were incorporated by reference in the bills of lading of Thurston Motor Lines under which it performed extensive carriage for the Defense Department. This action was brought by the United States alleging that Thurston had broken its contractual commitments by (1) refusing access to its personnel records, (2) refusing to develop and produce employment records with a racial identification of the employees, (3) discriminating in its employment practices, and (4) failing to develop and implement a formal affirmative action program for the employment of new black employees and for the promotion or transfer of black employees. The district court granted summary judgment for the defendant as to all phases of the case except the claimed denial of access to personnel records. It did so on the ground that there had been no attempt to conciliate other phases of the controversy, a general prerequisite to the institution of legal proceedings. As to the special affirmative action and special reporting claims, the district court also held that the relevant provisions of the Executive Order were inapplicable to Thurston because it had no single contract of $50,000 or more.

We think summary judgment for Thurston was mistaken.

I.

CONCILIATION

The representatives of the United States Postal Service, a contract compliance agency assigned to monitor Thurston's employment practices, repeatedly sought access to Thurston's personnel records. Such access was always denied. Though Moore, the Postal Service monitor, never explicitly threatened a referral of the matter to the Department of Justice unless he was given access to the personnel records, such access was repeatedly sought over a period of years and consistently refused. The district judge recognized that this met the requirement of "reasonable efforts within a reasonable time limitation to secure compliance with contract provisions of this Order by methods of conference, conciliation, mediation and persuasion * * *." Under § 209(b) of the Executive Order, such reasonable efforts are a prerequisite to the institution of legal action. It seems equally clear, however, that Moore also persistently sought records with racial identification, particularly such records relating to new hires, promotion, transfers and seniority data. Thurston's response was that it kept no such records. Indeed, it thought that

---

[**] Tom Clark, Associate Justice of the United States Supreme Court (Ret.), sitting by designation. Mr. Justice Clark participated in the hearing of this case, but died before an opinion had been prepared.

[1.] 41 C.F.R. § 60–1.5(a)(1).

recording the racial identification of its employees would be in violation of other laws. However, under 41 C.F.R. § 60–1.7(a)(3), a contractor having more than fifty employees and a contract of $50,000 or more may be required to keep such special records and to furnish them to a compliance agent upon request and in specified form. As to this, there was simply an impasse between the monitoring agent and Thurston's officials, the one repeatedly seeking such records while the others were equally insistent that they were under no obligation to keep or to produce them. At one time at least, Thurston offered to produce a computer printout listing all of Thurston's employees with considerable employment data, but this was not acceptable because of the absence of racial data, which Mr. Moore felt essential for his purposes.

■ It is less clear that there was adequate compliance with § 209(b)'s requirement of conference, conciliation, mediation and persuasion with respect to substantive discrimination by Thurston. Denied access to Thurston's existing personnel records and without the assistance of racial information as to all of its employees developed and supplied by Thurston, Moore did make inspections of several of Thurston's terminals, some of them more than once. This led to letters from Moore to Thurston officials. He urged them to do more than was being done to recruit black applicants. He thought that Thurston was not using sufficiently referral services for black job seekers. He complained of the general absence of blacks among the drivers and the seeming concentration of those who were employed in the more menial jobs. Thurston seems to have ignored some of these letters, but since Moore repeatedly raised these questions, indicating possible discriminatory practices, it cannot be said as a matter of law that he did not make reasonable efforts looking toward conciliation. This is not a case in which the possibility of actual discrimination was never mentioned by the monitor. It was mentioned by him on a number of occasions, and he did urge Thurston officials to intensify their efforts to bring blacks onto its payrolls and at higher grade levels.

This is not to say at this point that this court is finding that there was compliance by the Postal Service with § 209(b) of the Executive Order with respect to the charge of discriminatory practices. After a trial, it may be that the facts will be found against the Postal Service, but at this stage there seems clearly to be a dispute between the parties about the facts as they relate to compliance with § 209(b).

As far as this record discloses, there was never any discussion between Moore and Thurston officials about Thurston's development of formal, written, affirmative action programs for each of its terminals and its central office. That he thought applicable the special provisions for contractors having more than fifty employees and a contract of $50,000 or more may have been implicit in his request for a copy of Thurston's formalized affirmative action plan and his persistent requests for special reports with racial data. If, however, there was no attempt at conciliation to resolve this essential legal question, the absence of such conciliatory efforts should not bar a resolution of that question in this proceeding. This is essentially a legal inquiry, and it is now clear that the parties are in complete disagreement about it. The United States contends that Thurston's bills of lading may be aggregated for the purpose of meeting the $50,000 requirement, while Thurston insists that each bill of lading was a separate contract, the amounts of which are not subject to aggregation. This is the kind of dispute which is well beyond the possibility of conciliatory resolution. Since it is obvious that any attempt by Moore and Thurston officials to resolve such differences by agreement would have been fruitless, judicial resolution of the controversy in this proceeding should not be foreclosed.

## II.

### THE $50,000 CONTRACT QUESTION

Thurston is a trucking company having over 2,000 employees. It operates 32 terminals and does extensive haulage for the

United States. In each of the years in question its total government business exceeded $1,000,000; in two of those years, its government revenue exceeded $2,000,000.

A considerable portion of Thurston's business with the government is done under "Perishable Subsistence Carrier Rate Tender and Service Agreements." Under these "agreements", Thurston transported a large volume of perishable commodities to and from military depots and other military installations.

From time to time, the military estimates its requirements for the transportation of perishable commodities, and the Defense Supply Agency sends out lists and descriptions of anticipated hauls between a particular supply depot and the military installations it services. Interested carriers are invited to bid for the business by filing a "Rate Tender" as a § 22 tariff with the Interstate Commerce Commission. The "Agreement" portion of the complete document, prepared by the Defense Supply Agency, includes a provision that

> Carriers submitting tenders understand that those selected shall be entitled to all available traffic based on military requirements for the period of this tender and their ability to perform; however the Government does NOT guarantee that traffic will amount to the estimates herein.

Under § 22 of the Interstate Commerce Act,[2] motor common carriers are authorized to provide service to the United States at rates lower than their published tariffs applicable to other shippers. A special governmental rate is placed in effect by the carrier's filing with the Interstate Commerce Commission a § 22 rate schedule, and these filings are responsive to the government's invitation for bids. By regulation the government's business goes to the lowest bidder, subject to the rendition by the low bidder of comparable service.

The district court concluded that Thurston was not a $50,000 contractor simply because no single bill of lading involved so much money. In the record there are affidavits which describe the Perishable Subsistence Rate Tender and Service Agreements and the way they operate. There is also an affidavit under which it is said that in each of the years in question Thurston's revenue under a single such "agreement" exceeded $50,000. In its opinion, however, the district court took no notice of such "agreements."

We think that the Rate Tender and Service Agreements are themselves contracts for carriage. Under them the governmental agency does not guarantee that the volume of traffic will reach the preagreement estimates, but, subject to the rendition of acceptable service, the low bidder is assured that it will get all the traffic that the activity of the contracting agency generates. If several carriers file identical rate bids, the business is prorated among them, but each is assured of getting his pro rata share.

These arrangements amounted to requirements contracts.[3] The Defense Supply Agency and Thurston did not deal with each other solely on the basis of individual shipments. The Defense Supply Agency was not free to tender these shipments to competing carriers. The parties had negotiated and agreed upon a course of dealing over a period of time. The general agreement contemplated repetitive shipments. The fact that a separate bill of lading was issued in connection with each separate shipment does not make each bill of lading a contract separable from the general Rate Tender and Service Agreement under which the traffic was given to Thurston.

In a quite comparable situation under the Walsh-Healey Act, a general agreement respecting the sale of bakery products was held to be the governing contract and to fix the amount of the contract. Individual or-

---

**2.** 49 U.S.C. § 22.

**3.** See *Intermountain Rural Electric Assoc. v. Colorado Central Power Co.*, 322 F.2d 516 (10th Cir.1963); *Lima Locomotive & Machine Co. v.*

*National Steel Casting Co.*, 155 F. 77 (6th Cir. 1907); 1A Corbin on Contracts § 156 et seq. (1950 ed.).

ders placed by commissaries, no one of which amounted to as much as $10,000, might be said to be contracts in themselves, but the general agreement contemplated many such orders and the court held that it was the determinant whether the $10,000 minimum requirement had been met. *United Biscuit Company of America v. Wirtz*, 359 F.2d 206 (D.C.Cir.1965).

On this question, of course, there have been no findings of fact. If we must look to the Rate Tender and Service Agreements, as we hold, however, the facts in the affidavits filed on behalf of the United States would require a construction that in each year Thurston was a $50,000 or more contractor.

### III.

Summary judgment in favor of Thurston against the United States is vacated and the case remanded to the district court for further proceedings.

VACATED AND REMANDED.