**MILK TRAIN, INC., et al., Plaintiffs,**

v.

**Ann VENEMAN, Secretary, U.S. Department of Agriculture Defendant.**

**No. 00–1121 (TPJ).**

United States District Court, District of Columbia.

July 2, 2001.

Donald Michael Barnes, Seyfarth Shaw, Washington, DC, Benjamin F. Yale, Waynesfield, OH, for plaintiffs.

Rupa Bhattacharyya, Federal Programs Branch, Civil Division, Washington, DC, for defendants.

*MEMORANDUM AND ORDER*

JACKSON, District Judge.

Thirty-one large dairy producers bring this action challenging regulations issued by the U.S. Department of Agriculture ("USDA") governing the disbursement of funds from the Dairy Market Loss Assistance Program. Plaintiffs contend that the Secretary exceeded the scope of her rulemaking authority by issuing regulations that limit the amount of market loss assistance a dairy producer could receive. Plaintiffs are challenging the regulations on the grounds that they violate the Non–Delegation Clause, the Takings Clause, the Equal Protection Clause, and the Administrative Procedures Act. The case is currently before the Court on the parties' cross-motions for summary judgment.[1]

### I.

In 1998, responding to a sharp decline in milk prices that was causing a severe hardship in the dairy industry, Congress appropriated $200 million in the Agriculture, Rural Development, Food and Drug Administration and Related Agencies Appropriation Act for Fiscal Year 1999 ("FY'99 appropriations bill") for the USDA "to provide assistance to dairy producers in a manner determined by the Secretary." Pub.L. No. 105–277, § 1111(d), 112 Stat. 2681 (Oct. 21, 1999). In May 1999, USDA issued a final rule establishing the Dairy Market Loss Assistance Program ("DMLA"), which would be responsible for distributing the financial assistance to dairy producers. *See* Final Rule, 64 Fed. Reg. 24,933–24,936, codified at 7 C.F.R. §§ 1430.501 *et seq.* Endeavoring to distribute a finite sum of money to best effect, the Secretary issued regulations that favored smaller dairy producers by limiting the amount of assistance a producer could receive based on its production volume. Specifically, the regulations provided that all dairy producers who marketed milk in the last quarter of 1998 would be eligible for DMLA assistance, but their payments would be limited to the first 26,000 hundredweight ("cwt")[2] of milk pro-

---

1. A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), but only disputes over facts that may affect the outcome of a case will properly preclude an entry of summary judgment, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Moreover, to survive a motion for summary judgment, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See id.* The Court must draw all reasonable inferences of fact in favor of the non-moving party. *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994).

2. According to the USDA, the 26,000 cwt limit represents the average annual milk production of a 150–cow dairy farm. Because the average dairy farm in the United States con-

duced in either 1997 or 1998.[3] Plaintiffs claim that, as a result of the Secretary's allocation formula, approximately 90% of their milk production is ineligible for DMLA assistance.

In 1999, Congress again appropriated funds to assist dairy producers to cope with declining milk prices. The Agriculture, Rural Development, Food and Drug Administration and Related Agencies Appropriation Act for Fiscal Year 2000 ("FY'00 appropriations bill") provided $125 million to USDA to be distributed to "dairy producers, in the manner determined appropriate by the Secretary, to compensate for economic losses incurred during 1999." Pub.L. No. 106–78, § 805, 113 Stat. 1135 (Oct. 22, 1999). In February 2000, the USDA issued new rules applying the allocation formula adopted in the original DMLA Program to the newly appropriated funds. *See* Final Rule, 65 Fed.Reg., 7944–7945, 7956, codified at 7 C.F.R. §§ 1430, *et seq.*, as amended. The new rules also provided that any producer who had applied for funds in 1998 did not have to reapply to receive payments in 1999. These producers would automatically receive payments based upon their original 1998 applications.

The essence of this controversy is whether the Secretary exceeded her statutory authority by capping at 26,000 cwt the amount of milk production that would be eligible for financial assistance, the consequence of which was to bestow the bulk of the funding on smaller dairy farmers. This question obviously turns on the interpretation of the statutory language of the DMLA programs. The FY'99 appropriations bill directed the Secretary "to provide assistance to dairy producers *in a manner determined by the Secretary,*" and the FY'00 appropriations bill directed the Secretary to allocate the funds to "dairy producers, *in the manner determined appropriate by the Secretary,* to compensate for economic losses incurred during 1999." Plaintiffs argue that this statutory language does not provide the Secretary with any authority to cap payments to large producers, whereas the government contends that the language accords the Secretary broad discretion in determining how to distribute the funds.

Plaintiffs challenge the DMLA regulations on a number of grounds. First, plaintiffs argue that to infer authority in the Secretary to impose an eligibility limitation on DMLA payments would violate the Non–Delegation Clause of the Constitution because the statutory language did not authorize any limitations and the Secretary cannot identify an "intelligible principle" in the statutory language to assist her in determining how it might be permissible to impose them. Second, they argue that the regulations violate the Administrative Procedures Act ("APA") because the eligibility limitation is arbitrary and capricious. Third, plaintiffs contend that the limitation constitutes a "taking" under

---

sisted of 79 cows in 1997, the regulations allowed farms nearly twice the size of the national average to receive DMLA assistance for their full milk production in an eligible year. Consequently, the Secretary asserts that only those dairy operations with herds larger than twice the national average were affected by the 26,000 cwt limit.

**3.** The USDA calculated the "payment rate per cwt" by dividing the $200 million DMLA appropriation by the total of the eligible cwt of all dairy producers (not to exceed 26,000 cwt for any single dairy producer). To determine each dairy producer's actual payment, the USDA then multiplied the payment rate by each dairy producer's eligible production, which was limited to 26,000 cwt. Consequently, all dairy producers who produced more than 26,000 cwt (whether 30,000 cwt or 300,000 cwt) received the same DMLA payment.

the Takings Clause of the Constitution because plaintiffs did not receive as much assistance under DMLA as they would have received if the Secretary had, for example, adopted a *pro rata* distribution scheme. Fourth, plaintiffs claim that the regulations violate the Fifth Amendment's Equal Protection Clause because the regulations treat larger dairy operations differently—and less favorably—than smaller dairy operations.

## II.

 "The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress, U.S. Const., Art. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States,* 517 U.S. 748, 758, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). "The [Supreme] Court has also recognized, however, that the 'separation of powers principle and the non-delegation doctrine in particular, do not prevent Congress from obtaining the assistance of the coordinate branches.'" *National Federation of Federal Employees v. United States,* 905 F.2d 400, 404 (D.C.Cir.1990) (*quoting Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)). The Supreme Court's application of the non-delegation doctrine has been "driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta,* 488 U.S. at 372, 109 S.Ct. 647. Therefore, Congress does not violate the Constitution "merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Touby v. United States,* 500 U.S. 160, 165, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991).

 The test the Supreme Court has applied to determine whether Congress has violated the non-delegation doctrine is well-settled. "So long as Congress 'shall lay down an intelligible principle to which the person or body authorized to' [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Mistretta,* 488 U.S. at 372, 109 S.Ct. 647 (*quoting J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928)). Under the "intelligible principle" test, it is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Id.* at 372–73, 109 S.Ct. 647 (*quoting American Power & Light Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct. 133, 91 L.Ed. 103 (1946)). This test is not difficult to satisfy. *See National Federation,* 905 F.2d at 404. Indeed, the Supreme Court has not struck down legislation for violating the non-delegation doctrine since it invalidated two statutes over 65 years ago in *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), and *Panama Refining Corp. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). *See id.* (*citing Mistretta,* 488 U.S. at 373, 109 S.Ct. 647).

Acknowledging that the DMLA statutes themselves may not violate the non-delegation doctrine, plaintiffs nevertheless insist that the Secretary's DMLA regulations are unconstitutional because "there is no intelligible principle anywhere in the DMLA that assists the Secretary in determining whether to impose limits [on how much assistance each dairy producer may receive], let alone what those limits should be." Pls.' Opp'n at 26. Plaintiffs argue that the Secretary's decision to distribute the funds in a "non-uniform manner" amounts to the creation of new policy with-

out the required congressional authorization. In essence, plaintiffs' non-delegation doctrine argument can be summarized as follows: either the statute contemplates providing the Secretary wide discretion in allocating the funding in any manner she wishes—in which case the statute lacks an "intelligible principle" to guide the agency in promulgating regulations and violates the non-delegation doctrine—or the statute does not contemplate providing the Secretary such wide discretion—in which case the Secretary's regulations constitute new policy and impermissibly intrude on Congress's legislative authority. Either way, plaintiffs argue, the Secretary's regulations are unconstitutional.

In advancing this argument, plaintiffs rely almost exclusively on a D.C. Circuit opinion that has since been overturned by the Supreme Court. *See American Trucking Ass'ns, Inc. v. EPA*, 175 F.3d 1027 (D.C.Cir.1999), *rev'd, Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). In *ATA*, the D.C. Circuit struck down the EPA's National Ambient Air Quality Standards ("NAAQS") on non-delegation doctrine grounds, because the EPA had failed to articulate an "intelligible principle" in the Clean Air Act that guided the agency in its selection of factors used "in determining the degree of public health concern associated with different levels of ozone and [particulate matter]." *Id.* at 1034. The Supreme Court, however, explicitly rejected the D.C. Circuit's requirement that "statutes provide a 'determinate criterion' for saying 'how much [of a regulated harm] is too much.'" *Id.* at 913. The Supreme Court explained:

> In *Touby*, for example, we did not require the statute to decree how "imminent" was too imminent, or how "necessary" was necessary enough, or even-most relevant here-how "hazardous" was too hazardous. Similarly, the statute at

issue in *Lichter* authorized agencies to recoup "excess profits" paid under wartime Government contracts, yet we did not insist that Congress specify how much profit was too much. It is therefore not conclusive for delegation purposes that, as respondents argue, ozone and particulate matter are "nonthreshold" pollutants that inflict a continuum of adverse health effects at any airborne concentration greater than zero, and hence require the EPA to make judgments of degree. "[A] certain degree of discretion, and thus of lawmaking, inheres in most executive or judicial action."

*Id.* at 913–14 (citations omitted). Based on this reasoning, Congress did not have to specify, as plaintiffs argue, how the Secretary should distribute the DMLA funds among dairy farmers or even how "small" was too small when it encouraged the Secretary to adopt policies favoring small farms. Because plaintiffs' non-delegation doctrine argument was based primarily on the D.C. Circuit's decision in *ATA*, the Supreme Court's opinion in *ATA* almost entirely eviscerates plaintiffs' non-delegation doctrine argument.

In this case, the statutes governing the DMLA programs pass muster under *Mistretta*'s "intelligible principle" test and, therefore, do not run afoul of the non-delegation doctrine. First, Congress "clearly delineate[d] the general policy," which was to provide emergency relief to dairy farmers suffering from declining milk prices. Second, Congress charged a "public agency"—the Commodity Credit Corporation within the USDA—with the task of administering the program. Third, Congress established "boundaries of this delegated authority" by limiting the amount of funds ($200 million in FY'99 and $125 million in FY'00) that could be distributed under the program and by requir-

ing the Secretary to distribute the funds "as soon as practicable."

Though Congress did not specify a method of disbursing the DMLA funds, the Supreme Court has repeatedly recognized Congress's power to appropriate lump-sum amounts to agencies, leaving it to the agencies to use the funds to meet their statutory responsibilities in a manner they determine to be the most effective or most desirable. For instance, in *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 57 S.Ct. 764, 81 L.Ed. 1122 (1937), the Supreme Court upheld a statute that directed taxes on coconut oil production raised in the Philippine Islands to be paid into the Treasury of the Philippine Islands [4] without any restrictions on how the tax revenue should be spent. Concluding that Congress has wide discretion in detailing how appropriations can be spent, the Supreme Court wrote that appropriations bills "are replete with instances of general appropriations in large amounts, to be allotted and expended as directed by designated government agencies" and that the "constitutionality of this delegation of authority has never been seriously questioned." *Id.* at 321–22, 57 S.Ct. 764. In *Lincoln v. Vigil*, 508 U.S. 182, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993), the Supreme Court again upheld Congress's authority to confer broad discretion to government agencies in expending appropriations to fulfill their statutory obligations. The Court held that a "fundamental principle of appropriations law is that where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose binding restrictions." *Id.* at 192, 113 S.Ct. 2024 (internal quotations omitted).[5]

Although this Court does not find that the DMLA programs were true "lump-sum appropriations" in the sense of the *Cincinnati Soap* and *Lincoln* decisions, those cases are, nevertheless, instructive for one important reason: if Congress can provide lump-sum appropriations to agencies without specifying to what ends the funds should be spent, *a fortiori* Congress has the constitutional authority to appropriate funds for a more discreet purpose, such as the one that the DMLA programs were designed to address, without dictating how the funds should be allocated.

At bottom, the non-delegation doctrine would permit this Court to invalidate the DMLA programs only if there were "an absence of standards for guidance of the [agency's] action, so that it would be impossible in a proper proceeding to ascer-

4. The Philippine Islands were a U.S. "dependency" over which the U.S. government "exercised supreme power of legislation and administration." *Cincinnati Soap*, 301 U.S. at 314, 57 S.Ct. 764.

5. In *Lincoln,* Congress provided lump-sum appropriations to the Indian Health Service ("IHS") without indicating how the funds should be spent. IHS used the lump-sum appropriations to fund a regional health care program for handicapped Indian children that the agency—not Congress—had established. The agency eventually terminated the program and diverted the funds to another child assistance program. Because Congress had not established the regional health care program and the agency had funded the program with lump-sum appropriations, the decision to terminate the program was within the agency's discretion and was not subject to judicial review under the APA. The government argues that the fact that the *Lincoln* Court upheld Congress's lump-sum appropriation and IHS's decision to terminate the health care program without even considering the argument that such "un-restricted appropriations" would violate the delegation doctrine reinforces its contention that nothing in the Constitution precludes Congress from exercising its legislative powers in such a manner.

tain whether the will of Congress has been obeyed." *Yakus v. United States,* 321 U.S. 414, 426, 64 S.Ct. 660, 88 L.Ed. 834 (1944). As already demonstrated, this is not the case here.

## III.

Plaintiffs claim that the Secretary's method of disbursing DMLA funds by capping payments to larger dairy producers is "arbitrary and capricious."[6] In response, the government first argues that this Court does not have jurisdiction to review the Secretary's decision. If this Court concludes, however, that it does have jurisdiction to hear plaintiffs' APA claim, the government next argues, in the alternative, that the Secretary's decision is supported by facts in the administrative record and, therefore, was not arbitrary or capricious.

The Supreme Court has stated that the Administrative Procedures Act embodies a "basic presumption of judicial review." *Lincoln,* 508 U.S. at 190, 113 S.Ct. 2024. Under the APA, however, an agency action is not subject to judicial review if that action "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court has concluded that one such agency action committed to the agency's discretion and not subject to judicial review is the agency's allocation of lump-sum appropriations. *See Lincoln,* 508 U.S. at 192, 113 S.Ct. 2024.

The government argues that the Secretary's method of disbursing the DMLA funds—like the reallocation of lump-sum appropriations by the IHS in *Lincoln, see supra* note 5—is committed to agency discretion by law and, therefore, is unreviewable under the APA. Plaintiffs contend that the DMLA is not a lump-sum appro-

**6.** In relation to their APA claim, plaintiffs contend that the Secretary should be bound by a supposed "concession" in a document entitled "Decision Memorandum for the Secretary." The memorandum, prepared for the Secretary by a subordinate USDA official, specifically rejects a proposal submitted by the National Milk Producers Federation to limit payments to $6,000 per producer because "[e]stablishment of a payment limitation for these payments is not authorized by the 1999 Act." Decision Memorandum, Adm. Rec. 009. Despite this recommendation, however, the Secretary decided to cap the pounds of milk eligible for assistance rather than cap the overall payment, which plaintiffs insist is a "difference without a distinction." Pls.' Opp'n at 15. Indeed, plaintiffs calculate that the 26,000 cwt limitation effectively translates into a $5,844.77 payment limitation. Plaintiffs note that "[n]owhere in the Administrative Record can one find any explanation why capping payments at 26,000 cwt is authorized by the Act while capping payments at $6,000 is not." *Id.* at 16. Because of this inconsistency in the USDA's analysis, plaintiffs contend that the Court should provide no deference to the Secretary's interpretation of the statutory language.

Instead, plaintiffs argue that "the Secretary's own expression of illegality" should control. *Id.*

The government asserts that plaintiffs' argument is flawed because they misunderstand the concept of "payment limitations." The government asserts that "payment limitation" is a term of art used in the field of commodities regulation and that the Secretary's method of distributing DMLA funds is not, as plaintiffs argue, a "payment limitation." The government explains that regulations specifically define the term "payment limitation" and govern how and in which USDA programs payment limitations may be applied. *See* 7 C.F.R. part 1400.

The Court need not resolve this dispute over whether plaintiffs are confused about the meaning and use of the term "payment limitations" because the conclusions and recommendations in the Decision Memorandum are not binding on the Secretary. The Court notes that the memorandum was not prepared by the Secretary, but was prepared for her to assist in selecting an allocation formula. A cabinet secretary is clearly not bound by the recommendations and analysis of subordinate staff members.

priation, so *Lincoln* is inapplicable in this case. In *Lincoln*, Congress's lump-sum appropriation to the IHS was unrestricted and could have been used as the agency saw fit to achieve its overall statutory obligations. The DMLA appropriation, however, was appropriated for a specific purpose, for a specific period of time, and for a specific group of beneficiaries, insofar as Congress required the $200 million to be used to compensate dairy farmers suffering from declining milk prices in 1998. Therefore, the Court concludes that the DMLA program does not fall under the lump-sum appropriation exception to APA jurisdiction, and the Court must, therefore, review the Secretary's funding formula.

■ Plaintiffs contend that the Secretary's method of disbursing DMLA funds is arbitrary and capricious for several reasons. First, the statute does not authorize the Secretary to limit producers' DMLA funds based on their annual milk production. Second, the Secretary's decision to set the payment limit at 26,000 cwt instead of some other level is arbitrary and capricious.[7]

Plaintiffs argue that the Secretary's decision to "discriminate against producers based on size and limit producers' returns based upon production" is arbitrary and capricious. Compl. ¶ 60. The government responds that, because the statutes are silent as to whether the Secretary may impose eligibility criteria for determining the level of payment dairy farmers can receive under the DMLA programs, the statutes have left a "gap for the agency to fill." *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Because the statutes explicitly delegated policymaking authority to the Secretary to determine the method of disbursing DMLA funds, the government argues that the only question is whether the Secretary properly interpreted the statutes when she decided to set a maximum level of eligible milk production for the purposes of disbursing DMLA funds.

■ When reviewing an agency's interpretation of its governing statute, a court must apply the two-prong *Chevron* test. First, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. Second, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* When applying the *Chevron* test, the court need only ensure that the agency's interpretation is reasonable and does not violate congressional intent.

The government asserts that the Secretary had three possible options as to how a finite quantity of DMLA funds should be allocated among dairy farmers. First, the Secretary could have given each farmer an equal *per capita* share by dividing the DMLA appropriations by the total number

---

7. An agency is entitled to summary judgment in an APA rulemaking case unless a reviewing court concludes that the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it was "in excess of statutory jurisdiction, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). In such a case, the court must review the administrative record and "inquir[e] whether it can discern a ra- tional connection between the facts found and the choice made by the [agency], and whether the [agency] has considered all the relevant factors and provided an adequate explanation to support its decision." *Northern Municipal Distributors Group v. Federal Energy Regulatory Comm'n,* 165 F.3d 935, 941 (D.C.Cir.1999). Indeed, the court must affirm the agency's action if the agency provides a rational basis for its decision.

of dairy farmers, giving each farmer an equal payment regardless of its size or milk production capacity. *See* Gov't Statement of Material Facts as to Which There is No Genuine Dispute ("Gov't SOF") ¶ 15. Second, the Secretary could have linked the DMLA payments to production by paying each farmer a flat rate for each cwt of milk produced. *See id.* Third, the Secretary could have linked the payments to production, but placed a limit on the amount of milk eligible for DMLA payments. *See id.* The first option would have favored small farmers, and the second option—advocated by plaintiffs here—would have favored larger farmers. The Secretary chose the "middle-ground" option.

The administrative record analyzes each of the options. *See id.* ¶¶ 16–21. The first *"per capita"* option would have provided $1,714 per farm with 29% of the funds being paid to the 33,240 farms with fewer than 30 cows and only 6% of the funds being paid to the 7,250 dairy operations with more than 200 cows.[8] The second "production-linked" option—which plaintiffs support—would have provided 45% of the DMLA funds to 6.2% of the largest farming operations in the country. The third hybrid or "production eligibility limit" option included three sub-options: (1) a 17,000 cwt limit; (2) a 26,000 cwt limit; and (3) a 34,000 cwt limit. Each of these sub-options fell between the first two options, providing a higher payment rate per cwt—21.7 cents per cwt, 19.1 cents per cwt, and 18 cents per cwt, respectively—while avoiding the singularly large payments to larger dairy producers at the expense of smaller dairy farmers that would have occurred under plaintiffs' preferred plan.

Pursuant to the first prong of the *Chevron* test, nothing in the governing statutes explicitly controls the Secretary's selection of a payment method. Indeed, there is no support whatsoever for plaintiffs' claim that the Secretary was required by the statute to choose their preferred distribution method. Because the Secretary's method of distribution is not contrary to the "unambiguously expressed intent of Congress," the second prong of the *Chevron* test requires the Court to determine whether the Secretary's choice is reasonable.

The Supreme Court has stated that "an agency to which Congress has delegated policymaking responsibility may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments." *Chevron,* 467 U.S. at 865, 104 S.Ct. 2778. The government argues that the Secretary's method of disbursing DMLA funds is reasonable in light of Congress's request in the Conference Report of the 1999 Omnibus Act to consider the needs of small farmers when developing farming policy. The Conference Report states: "[t]he conferees urge the Secretary to coordinate activities and to encourage policy considerations within existing programs of the Department that promote the needs of small farm operators and that may help reverse the unwarranted decline of small farm operations." H.R.Rep. No. 105–825, at 991. Therefore, considering the department's general policy of focusing scarce federal resources on struggling small farm operations, the Court concludes that the Secretary's selection of the hybrid "production eligibility limit" method of distributing DMLA funds was not arbitrary or capricious.

---

**8.** These 7,250 dairy farms that each have over 200 cows produce 45% of the nation's milk supply. *See* Gov't SOF ¶ 16.

Plaintiffs also argue that the Secretary's selection of 26,000 cwt as the production eligibility limit was arbitrary and capricious. The government contends not only that the Secretary fully justified her policy choice in the record, but that the Secretary's decision to set the limit at 26,000 cwt was not arbitrary or capricious, but eminently rational.

As explained above, the Secretary considered a total of five different payment methods: the *"per capita"* option, the "production-linked" option, and three variations of the "production eligibility limit" option. The Secretary rejected the first two "extreme" options and focused on the three variations of the third option. The 17,000 cwt limit represented the average annual milk production of a 100–cow farm. A 100–cow farm generates approximately $250,000 in sales, which is the maximum amount of sales for a "small" farm as defined by the USDA Commission on Small Farms. The 26,000 cwt limit represented the average annual milk production of a 150–cow farm. The 34,000 cwt limit represented the average annual milk production of a 200–cow farming operation. As the government explains:

> The decision to choose 26,000 cwt, the average production of a 150–cow farm, for the purposes of distributing the funds appropriated under the 1999 Act, and to apply that choice when allocating the funds made available under the 2000 Act, is essentially a compromise position that favors smaller farms and maximizes benefits to larger farms. It is critical to note that, under the 26,000 cwt limit, no eligible producer was excluded from receiving some share of the DMLA funds, and, on average, every eligible producer who milked up to 150 cows received assistance commensurate with their full milk production in an eligible year. Because the average herd size in the United States is 79 cows, SOF ¶ 2, generally

only those dairy operations with herds more than twice the size of the national average were subject to the 26,000 cwt production limit for the purposes of calculating benefits payments.

Gov't Mot. at 27.

■ When the Secretary selected the "middle-ground" production limit option for distributing DMLA funds, she then was obliged to chose a specific cwt limit. She considered three options, and once again, selected the middle-of-the-road choice. As the D.C. Circuit has stated, "[t]here may be no strong reason for choosing [a numerical standard] rather than a somewhat higher or lower number. If so, we will uphold the agency's choice of a numerical standard if it is within a zone of reasonableness." *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 525 (D.C.Cir.1983) (citations omitted). Here, the Secretary's choice of the 26,000 cwt limit and her justifications thereof fall within "a zone of reasonableness." Therefore, the Court concludes that the Secretary's decision was not arbitrary or capricious and, therefore, is upheld under the APA.

### IV.

■ Plaintiff's challenge to the regulations based on the Takings Clause of the Fifth Amendment does not merit extensive consideration. Plaintiffs' claim that the Secretary's funding formula constitutes a "taking" cannot stand under Supreme Court precedent. Although plaintiffs contend that they would have received an additional $4 million in federal funds under their preferred funding formula, they fail to offer a credible legal basis for any expectation for a larger share of DMLA funds. In *Bowen v. Gilliard,* 483 U.S. 587, 604, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987), the Supreme Court rejected a Fifth

Amendment challenge to benefit reductions in an existing welfare entitlement program, concluding that "Congress is not, by virtue of having instituted a ... program, bound to continue it at all, much less at the same level." Of course, plaintiffs here have an even weaker case than the plaintiffs in *Bowen*, because these plaintiffs are challenging the allocation of funds in a new program, not cuts to an existing entitlement program. And as the Supreme Court stated in *Bowen*, "[i]t is hard to believe that [the Court] would seriously entertain an argument that a new benefit program constituted a taking." *Id.*

## V.

■■■■■ The Court also need not spend much time on plaintiffs' challenge to the DMLA programs on Equal Protection grounds because it clearly is not a viable claim. In essence, plaintiffs insist that the Secretary's funding formula "discriminates" against dairy producers based on the size of their operations. However, because large farmers are not a suspect class and a fundamental right is not at issue, the appropriate level of scrutiny for the regulations is rational basis review. The Secretary's decision easily survives this type of deferential review: Because it is reasonable to conclude that smaller farms are more severely impacted by declining milk prices than larger farms and smaller farmers are more likely to benefit from the government's relatively small benefit payments, the Secretary's decision to target a larger percentage of emergency funds to small farms is reasonable and justifies the classification.

For the foregoing reasons, it is, therefore, this 2nd day of July, 2001,

ORDERED, that the defendant's motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied; and it is

FURTHER ORDERED, that the Clerk of Court shall forthwith enter final judgment for defendant dismissing the complaint with prejudice.